2011R01024/jmd/ajb

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Stanley R. Chesler |
| | : | |
| v. | : | Crim. No. 13-615 |
| | : | |
| SANTOS REYES-VILLATORO, | : | 18 U.S.C. § 924(c) |
| a/k/a "Mousey," | : | 18 U.S.C. § 924(j) |
| MARIO OLIVA, | : | 18 U.S.C. § 1958(a) |
| a/k/a "Zorro," | : | 18 U.S.C. § 1959(a)(1) |
| ROBERTO CONTRERAS, | : | 18 U.S.C. § 1959(a)(3) |
| a/k/a "Demonio," | : | 18 U.S.C. § 1959(a)(4) |
| JULIAN MOZ-AGUILAR, | : | 18 U.S.C. § 1959(a)(5) |
| a/k/a "Humilde," | : | 18 U.S.C. § 1962(d) |
| a/k/a "Demente," | : | 21 U.S.C. § 846 |
| a/k/a "Tio Felito," | : | 18 U.S.C. § 2 |
| HUGO PALENCIA, | : | 18 U.S.C. § 3 |
| a/k/a "Taliban," | : | |
| JOSE GARCIA, | : | |
| a/k/a "Chucky," | : | |
| a/k/a "Diabolico," | : | |
| RUBEN PORTILLO-FUENTES, | : | |
| a/k/a "Sombra," | : | RECEIVED |
| a/k/a "Gordo," | : | |
| ESAU RAMIREZ, | : | SEP 19 2013 |
| a/k/a "Panda," | : | |
| KELVIN MEJIA, | : | AT 8:30_____M |
| a/k/a "Machete," | : | WILLIAM T. WALSH, CLERK |
| FRANKLIN MEJIA, | : | |
| a/k/a "Frankbo," | : | |
| a/k/a "Grillo," | : | |
| JULIO ADALBERTO ORELLANA-CARRANZA, | : | |
| a/k/a "Player," | : | |
| a/k/a "Stewie," | : | |
| a/k/a "Rata," | : | |
| CRUZ FLORES, | : | |
| a/k/a "Bruja," | : | |
| WALTER YOVANY-GOMEZ, | : | |
| a/k/a "Cholo," and | : | |
| JOSE ROMERO-AGUIRRE, | : | |
| a/k/a "Conejo," | : | |
| a/k/a "Justin Locote," | : | |

I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

COUNT ONE
(Racketeering Conspiracy)

Introduction

1.    At all times relevant to this Indictment, La Mara Salvatrucha, also known as "MS-13," was an international street gang operating in the District of New Jersey and elsewhere.    The gang's membership was composed largely of Salvadorans and immigrants from El Salvador.

2.    MS-13 originated in Los Angeles, California in the 1980s, where members engaged in turf wars with other criminal organizations for control of drug distribution networks.    Some MS-13 members returned to El Salvador, where the gang flourished and spread across Central America, while other members expanded the organization across the United States.

3.    MS-13 was organized into a series of sub-units -- or "cliques" -- that operated in specific geographic locations. One such clique was Plainfield Locos Salvatrucha (the "PLS clique"), which operated in and around Plainfield, New Jersey. According to MS-13 rules, any act committed in furtherance of a clique was, by definition, committed in furtherance of MS-13 as a whole.    Like all other MS-13 cliques, the PLS clique

2

established its own internal traditions and hierarchy while adhering to the umbrella rules and protocols of MS-13, including:

a. Use of a system of rules and regulations governing admission to and membership in MS-13, which typically involved an initiation process known as "jumping in," wherein MS-13 members beat the individual seeking membership for thirteen seconds;

b. Various visible demonstrations of gang affiliation, including an identification with the color blue, which appeared prominently in clothing, hats, and bandanas; tattoos signifying their membership in the PLS clique and in MS-13 generally; use of the machete in certain violent crimes; and use of a system of verbal codes and hand signals to communicate with each other and to signify their association with MS-13; and

c. A long-term and often lethal rivalry with other Latin American street gangs, including the 18th Street Gang and the Latin Kings, whose members were sometimes referred to as "chavalas."

4. MS-13 retaliated quickly and viciously to anyone who disrespected or threatened the gang's authority, power, reputation, or control of a neighborhood. MS-13 members often targeted members of rival gangs, but on numerous occasions also retaliated against MS-13 members and associates suspected of

3

disloyalty or violation of gang rules. Penalties included beatings, stabbings, and in some cases, death.

5. Within MS-13, participation in criminal activity by a member or associate, particularly violent acts directed at rival gangs or as directed by the gang leadership, increased the respect accorded to that member or associate, resulted in that member or associate maintaining or increasing position in the gang, and could result in a promotion to a leadership position.

6. MS-13 ordered murders through a process known as "greenlighting." If MS-13 members identified a certain individual as a threat to the gang, MS-13 leadership could "green light" that person, meaning that other MS-13 members had authorization -- if not the obligation -- to kill the individual. "Greenlighting" orders were enforceable nationwide and internationally by all members of MS-13; in other words, a greenlighting order issued by the PLS clique would be recognized and enforced by other MS-13 cliques in other locations, and vice versa.

7. The criminal activity of MS-13 also included the extortion of inactive members of MS-13, through a process known as "collecting rent." The gang's leadership directed active members of MS-13 to collect monthly tribute payments from the gang's inactive members. These payments, known as "rent," were used to finance the gang's activities, including the purchasing

4

of firearms and other weapons used by MS-13 members to commit
violent crimes. At the direction of the gang's leadership, MS-
13 members threatened to commit -- and on occasion did commit --
violent acts against inactive members who failed to make regular
rent payments.

8.    MS-13 maintained several "safe houses" in and around
Plainfield, New Jersey, where members stored weapons, planned
crimes, and purchased, sold, used, and hid controlled
substances. In some cases, members of the PLS clique resided in
these safe houses on a temporary or semi-permanent basis, as did
MS-13 members from other cliques across the country who were
attempting to evade arrest and prosecution.

9.    Like other MS-13 cliques, the PLS clique maintained a
hierarchical organization under the control of a single leader,
sometimes described as the "First Word." The First Word
supervised the activities of the enterprise, enforced
discipline, and authorized violent acts committed by other
members of the gang. Among other responsibilities, the First
Word made the final decision on whether to "greenlight" a
particular individual and oversaw the collection of "rent"
payments from inactive members of the clique. In addition to
the First Word, the clique's leadership included at least one
deputy, sometimes described as the "Second Word," who consulted

with the First Word and who weighed in on violent acts to be committed by gang members.

10. At all times relevant to this Indictment, members of the PLS clique met regularly to discuss gang activities. These meetings, which occurred on a weekly or biweekly basis, typically on Friday or Saturday nights, occurred at various locations in and around Plainfield, New Jersey. At these meetings, MS-13 members discussed their recent criminal activities and planned future violent acts. The First Word, along with other members of his leadership team, presided over these meetings, leading discussions and issuing orders. Among other things, MS-13 members used these meetings to vote on whether to "greenlight" specific targets, with the First Word ultimately responsible for deciding whether a certain individual should be subject to a greenlighting order. In addition, MS-13 members used these meetings to discuss the collection of "rent" extortion payments from older, inactive members of the gang, as discussed above, and to plan retaliation against those who failed to make their payments.

## The Racketeering Enterprise

11. MS-13, including the leaders, members, and associates of the PLS clique and other cliques, in the District of New Jersey, and elsewhere, constituted an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is, a group

6

of individuals associated in fact. The enterprise constituted an ongoing organization whose members functioned as a continuing unit that had a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

### Purposes of the Enterprise

12. The purposes of MS-13 included the following:

a. Preserving and protecting the power, territory, reputation, and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults, and murder;

b. Promoting and enhancing the enterprise and its members' and associates' activities, including, but not limited to, drug trafficking, robberies, extortion, and other criminal activities;

c. Keeping victims, potential victims, and community members in fear of the enterprise and its members and associates through violence and threats of violence;

d. Providing financial support and information to gang members, including those incarcerated in the United States and El Salvador; and

e. Providing assistance to other gang members who committed crimes on behalf of the gang, to hinder, obstruct, and prevent law enforcement officers from identifying the offenders,

7

apprehending the offenders, and successfully prosecuting and
punishing the offenders.

## The Defendants

13. Defendant SANTOS REYES-VILLATORO, a/k/a "Mousey,"
("SANTOS REYES VILLATORO") was a member of MS-13 and one of the
founding members of the PLS clique. SANTOS REYES-VILLATORO
helped create the PLS clique in the mid-1990s and, for a number
of years, held the leadership title of First Word. As First
Word, SANTOS REYES-VILLATORO presided over gang meetings,
supervised "rent" collections, issued "greenlighting" orders,
and instructed fellow gang members to commit violent acts. In
November 2009, SANTOS REYES-VILLATORO was arrested and jailed
for his involvement in the attempted murder of Victim #6 and
Victim #7, prompting him to relinquish his formal leadership
position and to assume a lower profile within the gang. While
in jail, SANTOS REYES-VILLATORO remained involved as a member of
MS-13 and resumed his active involvement in the gang once he was
released from jail in April 2011.

14. Defendant MARIO OLIVA, a/k/a "Zorro," ("MARIO OLIVA")
was a member of MS-13 who served as Second Word of the PLS
clique under SANTOS REYES VILLATORO and then ascended to the
position of First Word in or about November 2009 when SANTOS
REYES VILLATORO was arrested and relinquished the position. As
First Word, MARIO OLIVA presided over gang meetings, supervised

"rent" collections, issued "greenlighting" orders, and instructed fellow gang members to commit violent acts. On or about February 27, 2010, MARIO OLIVA murdered Victim #10, a female member of MS-13 subject to a "greenlighting" order. Shortly after the murder, MARIO OLIVA fled to Maryland, where he lived with members of MS-13 to avoid arrest and prosecution for Victim #10's murder. MARIO OLIVA's relocation forced him to relinquish his position as First Word of the PLS clique, although he remained in communication with his associates and returned to Plainfield from time to time to meet with fellow gang members.

15. Defendant ROBERTO CONTRERAS, a/k/a "Demonio," ("ROBERTO CONTRERAS") was a member of MS-13 who served as Second Word of the PLS clique under MARIO OLIVA and then ascended to the position of First Word in or about March 2010 when MARIO OLIVA fled to Maryland and relinquished the position. As First Word, ROBERTO CONTRERAS presided over gang meetings, supervised "rent" collections, issued "greenlighting" orders, and instructed fellow gang members to commit violent acts.

16. Defendants JULIAN MOZ-AGUILAR, a/k/a "Humilde," a/k/a "Demente," a/k/a "Tio Felito," ("JULIAN MOZ-AGUILAR"); HUGO PALENCIA, a/k/a "Taliban," ("HUGO PALENCIA"); JOSE GARCIA, a/k/a "Chucky," a/k/a "Diabolico," ("JOSE GARCIA"); RUBEN PORTILLO-FUENTES, a/k/a "Sombra," a/k/a "Gordo," ("RUBEN PORTILLO-

9

FUENTES"); ESAU RAMIREZ, a/k/a "Panda," ("ESAU RAMIREZ"); KELVIN MEJIA, a/k/a "Machete," ("KELVIN MEJIA"); FRANKLIN MEJIA, a/k/a "Frankbo," a/k/a "Grillo," ("FRANKLIN MEJIA"); JULIO ADALBERTO ORELLANA-CARRANZA, a/k/a "Player," a/k/a "Stewie," a/k/a "Rata," ("JULIO ADALBERTO ORELLANA-CARRANZA"); CRUZ FLORES, a/k/a "Bruja," ("CRUZ FLORES"); WALTER YOVANY-GOMEZ, a/k/a "Cholo," ("WALTER YOVANY-GOMEZ"); and JOSE ROMERO-AGUIRRE, a/k/a "Conejo," a/k/a "Justin Locote," ("JOSE ROMERO-AGUIRRE") were all members of the MS-13 enterprise and associated with the PLS clique. Among other things, as members of MS-13, JULIAN MOZ-AGUILAR, HUGO PALENCIA, JOSE GARCIA, RUBEN PORTILLO-FUENTES, ESAU RAMIREZ, KELVIN MEJIA, FRANKLIN MEJIA, and JULIO ADALBERTO ORELLANA-CARRANZA agreed that members of the PLS clique would collect "rent" from inactive gang members, attack and kill actual and suspected members of rival gangs, and identify and retaliate against individuals who were suspected of cooperating with law enforcement.

## The Racketeering Conspiracy

17. Beginning on a date unknown to the Grand Jury but since at least December 2008 and continuing through September 2013, in the District of New Jersey, and elsewhere, the defendants,

SANTOS REYES-VILLATORO,
a/k/a "Mousey,"
MARIO OLIVA,
a/k/a "Zorro,"
ROBERTO CONTRERAS,
a/k/a "Demonio,"
JULIAN MOZ-AGUILAR,
a/k/a "Humilde," a/k/a "Demente," a/k/a "Tio Felito,"
HUGO PALENCIA,
a/k/a "Taliban,"
JOSE GARCIA,
a/k/a "Chucky," a/k/a "Diabolico,"
RUBEN PORTILLO-FUENTES,
a/k/a "Sombra," a/k/a "Gordo,"
ESAU RAMIREZ,
a/k/a "Panda,"
KELVIN MEJIA,
a/k/a "Machete,"
FRANKLIN MEJIA,
a/k/a "Frankbo," a/k/a "Grillo," and
JULIO ADALBERTO ORELLANA-CARRANZA,
a/k/a "Player," a/k/a "Stewie," a/k/a "Rata,"

together with others known and unknown, each being a person

employed by and associated with MS-13, an enterprise engaged in,

and the activities of which affected, interstate and foreign

commerce, knowingly and intentionally conspired and agreed with

each other and others to violate Title 18, United States Code,

Section 1962(c), that is to conduct and participate, directly

and indirectly, in the conduct of the affairs of the MS-13

enterprise through a pattern of racketeering activity, as

defined in Title 18, United States Code, Sections 1961(1) and

(5), which pattern of racketeering activity consisted of

multiple acts involving offenses chargeable under the following provisions of New Jersey law:

     a.    Murder, in violation of N.J.S.A. 2C:11-3;

     b.    Robbery, in violation of N.J.S.A. 2C:15-1;

     c.    Extortion, in violation of N.J.S.A. 2C:20-5;

and multiple acts which are indictable under the following provision of Title 18, United States Code:

     d.    18 U.S.C. § 1958(a) (murder-for-hire);

and offenses involving the felonious manufacture, importation, receiving, concealing, buying, selling, and otherwise dealing in a controlled substance punishable under the laws of the United States, specifically:

     e.    21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances);

     f.    21 U.S.C. § 841 (distribution and possession with intent to distribute controlled substances);

     g.    21 U.S.C. §§ 952, 960, 963 (conspiracy to import controlled substances); and

     h.    21 U.S.C. § 843(b) (use of a communication facility).

    18.    It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of

12

racketeering activity in the conduct of the affairs of the enterprise.

## Manner and Means of the Conspiracy

19. It was part of the manner and means of the conspiracy that the defendants, as members of MS-13, were required to attend and did attend regular meetings to discuss, among other things: the structure and organization of the gang; past criminal acts committed against rival gang members and others; MS-13 members who were arrested or incarcerated; the disciplining of MS-13 members; enforcement of gang rules; police interactions with MS-13 members; the identities of individuals suspected of cooperating with law enforcement and proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, including murder, extortion, illegal possession of firearms, and assault, as well as ways to conceal these crimes.

20. It was further part of the manner and means of the conspiracy that the defendants and other members and associates of MS-13 purchased, maintained, and circulated a collection of firearms and machetes for use in criminal activity by MS-13 members.

21. It was further part of the manner and means of the conspiracy that the defendants and other members and associates of MS-13 committed and agreed to commit acts of violence,

13

including murder, attempted murder, and assault with a deadly weapon, against rival gang members or others when it suited the enterprise's purposes. MS-13 also used violence to impose discipline within the gang, including against members of MS-13 who associated with members of rival gangs.

22. It was further part of the manner and means of the conspiracy that the defendants and other members and associates of MS-13 financed the enterprise through a variety of activities, including the sale of controlled substances, armed robberies, and the extortion of money -- or "rent" -- from other individuals.

23. It was further part of the manner and means of the conspiracy that the defendants and other members and associates of MS-13 distributed and agreed to distribute controlled substances, to use the telephone to facilitate drug distribution, to commit robberies and other crimes, and to conceal their criminal activities by obstructing justice, threatening and intimidating witnesses, and other means.

24. It was further part of the manner and means of the conspiracy that the defendants and other members and associates of MS-13 persuaded, induced, enticed, and coerced females -- many of whom were under the age of eighteen -- to engage in sexual activity for the gratification of MS-13 members and

others. In certain cases, the sexual activity occurred without the consent of the minor females.

## Overt Acts

25. In furtherance of the conspiracy and to achieve the objectives thereof, the defendants performed or caused to be performed the following overt acts, among others, in the District of New Jersey and elsewhere:

a. On a date prior to November 2009, SANTOS REYES-VILLATORO ascended to the top leadership position in the PLS clique, a title known as the "First Word."

b. On a date prior to November 2009, MARIO OLIVA ascended the position of second-in-command in the PLS clique, a title known as the "Second Word."

c. At regular MS-13 meetings beginning no later than December 2008 and continuing through in or about November 2009, in Plainfield, New Jersey, and elsewhere in New Jersey, SANTOS REYES-VILLATORO instructed MS-13 members to collect "rent" from inactive members of the gang and to threaten violence against anyone who failed to make timely payments.

d. On or about December 5, 2008, in New Jersey, HUGO PALENCIA, KELVIN MEJIA, and other members of MS-13 attacked Victim #1 and Victim #2, who were junior members of the rival Latin Kings gang. During the altercation, HUGO PALENCIA fired a gun at the rival gang members.

e.    On or about January 25, 2009, in New Jersey, SANTOS REYES-VILLATORO instructed another member of MS-13 to kill members of a rival gang.

f.    On or about January 25, 2009, in Plainfield, New Jersey, at the direction of SANTOS REYES-VILLATORO, a member of MS-13 fired multiple shots into a car occupied by individuals the shooter believed were members of the rival Latin Kings gang. Victim #3 and Victim #4 were injured in the shooting.

g.    On or about February 8, 2009, in Plainfield, New Jersey, SANTOS REYES-VILLATORO ordered another member of MS-13 to kill members of the rival Latin King gang.

h.    On or about February 8, 2009, in Plainfield, New Jersey, at the direction of SANTOS REYES-VILLATORO, JULIAN MOZ-AGUILAR murdered Victim #5.

i.    On a date after February 8, 2009, JULIAN MOZ-AGUILAR obtained a tattoo depicting an MS-13 symbol in recognition of his role in the murder of Victim #5.

j.    On or about October 31, 2009, in Plainfield, New Jersey, KELVIN MEJIA and FRANKLIN MEJIA confronted members of the rival 18th Street Gang and KELVIN MEJIA brandished a firearm with the intent to intimidate members of the rival gang.

k.    On or about October 31, 2009, shortly after the confrontation described in Overt Act j, SANTOS REYES-VILLATORO and KELVIN MEJIA drove in SANTOS REYES-VILLATORO's car to a

16

house in North Plainfield, New Jersey that they believed was occupied by 18th Street Gang members involved in the confrontation earlier that day.

l.    On or about October 31, 2009, in North Plainfield, New Jersey, while SANTOS REYES-VILLATORO was driving the vehicle described in Overt Act k, KELVIN MEJIA opened a rear window to the car and fired several shots at the house they believed was occupied by members of the rival 18th Street gang, injuring Victim #6 and Victim #7.

m.    On a date after October 31, 2009, but prior to February 27, 2010, MARIO OLIVA ascended to the position of "First Word" within the PLS clique.

n.    On a date after October 31, 2009, but prior to February 27, 2010, ROBERTO CONTRERAS ascended to the position of "Second Word" within the PLS clique.

o.    On a date after October 31, 2009, but prior to February 27, 2010, MARIO OLIVA, in his capacity as "First Word," instructed MS-13 members to collect "rent" from inactive members of the gang and to threaten violence against anyone who failed to make timely payments.

p.    On a date after October 31, 2009, but prior to February 27, 2010, ROBERTO CONTRERAS drove two girls under the age of eighteen, Victim #8 and Victim #9, to a private residence

in Bound Brook, New Jersey, for the purpose of coercing the
minors to engage in sexual intercourse.

q.    After arriving at the private residence described
in Overt Act p, MARIO OLIVA and ROBERTO CONTRERAS used their
status as high-ranking members of MS-13 to coerce Victim #8 and
Victim #9 into engaging in sexual activity, further establishing
the role and authority of MARIO OLIVA and ROBERTO CONTRERAS in
the gang.

r.    On a date prior to February 27, 2010, after
consulting with other members of MS-13, MARIO OLIVA authorized
the "greenlighting" -- or murder -- of Victim #10, a female
member of MS-13.

s.    On or about February 27, 2010, MARIO OLIVA and at
least one other MS-13 member drove Victim #10 to an industrial
area in Piscataway, New Jersey.

t.    On or about February 27, 2010, MARIO OLIVA and
another member of MS-13 shot and killed Victim #10.

u.    On a date after February 27, 2010, ROBERTO
CONTRERAS transported an MS-13 member involved in Victim #10's
murder from New Jersey to Maryland in order to help that
individual evade arrest and prosecution for the murder.

v.    On a date after the activity described in Overt
Act u, ROBERTO CONTRERAS transported MARIO OLIVA from New Jersey

to Maryland to assist MARIO OLIVA in evading arrest and prosecution for Victim #10's murder.

     w.    On a date after February 27, 2010, but prior to the summer of 2010, ROBERTO CONTRERAS ascended to the position of "First Word" within PLS.

     x.    On a date after February 27, 2010, but prior to February 2011, ROBERTO CONTRERAS, in his capacity as "First Word," authorized the "greenlighting" -- or murder -- of an MS-13 member suspected of cooperating with law enforcement in the investigation and prosecution of Victim #10's murder.

     y.    On a date after February 27, 2010 and continuing until at least January 2011, ROBERTO CONTRERAS, in his capacity as "First Word," instructed MS-13 members to collect "rent" from inactive members of the gang and to threaten violence against anyone who failed to make timely payments.

     z.    On or about October 31, 2010, after participating in a fight at a nearby bar, members of MS-13 evaded law enforcement by hiding in an apartment on West Front Street in Plainfield, New Jersey.

     aa.   On or about November 10, 2010, in Plainfield, New Jersey, HUGO PALENCIA threatened a member of a rival gang near Barack Obama Academy in Plainfield, New Jersey.

     bb.   On or about November 11, 2010, in Plainfield, New Jersey, HUGO PALENCIA handed a firearm to another member of MS-

13 and instructed him to shoot and kill the rival gang member described in Overt Act aa.

cc. On or about November 11, 2010, in Plainfield, New Jersey, at the direction of HUGO PALENCIA, the MS-13 member described in Overt Act bb fired a gun, resulting in the death of Victim #11.

dd. On a date after November 11, 2010, but before January 10, 2011, while HUGO PALENCIA was detained at the Union County Jail, HUGO PALENCIA and JOSE GARCIA agreed that members of MS-13 would offer their services in a murder-for-hire.

ee. In or about December 2010 and early January 2011, JOSE GARCIA contacted MS-13 members living in the Washington, D.C. area to request that they travel to New Jersey in order to assist with the murder-for-hire described in Overt Act dd.

ff. On or about January 9, 2011, a member of MS-13 murdered Victim #12, a member of the rival 18th Street Gang, in front of Pueblo Viejo, a bar in Plainfield, New Jersey that was popular with MS-13 members.

gg. On or about January 10, 2011, JOSE GARCIA arranged to host members of MS-13 living in the Washington, D.C. area in New Jersey while they assisted him with the murder-for-hire described in Overt Acts dd-ee.

hh. On a date after January 10, 2011, but no later than January 31, 2011, while HUGO PALENCIA was detained at the

Union County Jail, ROBERTO CONTRERAS informed HUGO PALENCIA about the murder of Victim #12 described in Overt Act ff, allowing HUGO PALENCIA to remain informed about MS-13's activities and involved in the gang's decision-making while he was detained.

ii. On or about May 7, 2011, in Plainfield, New Jersey, using the same firearm discharged in the murder of Victim #12 described in Overt Act ff, RUBEN PORTILLO shot Victim #13 in order to intimidate the victim and to further establish MS-13's control and dominion over its "turf" in the area.

jj. On or about May 8, 2011, JOSE GARCIA assaulted Victim #14 as part of an ongoing feud between MS-13 members and members of Victim #14's family.

kk. On or about May 8, 2011, and after the assault described in Overt Act jj, RUBEN PORTILLO-FUENTES sent an electronic message to a family member of Victim #14 threatening him with bodily injury, in order to intimidate Victim #14 and to increase respect for MS-13.

ll. In or about May 2011, the leadership of MS-13 assigned certain members of the gang, including KELVIN MEJIA and JULIO ADALBERTO ORELLANA-CARRANZA, to murder members of rival gangs. These assignments were known within the PLS clique as "missions."

mm. On or about May 8, 2011, while inside the Plainfield apartment described in Overt Act z, two members of MS-13 -- Cruz Flores, a/k/a "Bruja," and Walter Yovany-Gomez, a/k/a "Cholo," both of whom are charged in Counts Eighteen and Nineteen of this Indictment -- murdered Victim #15 because they believed that Victim #15 was associating with members of the rival 18th Street Gang. In killing Victim #15, Cruz Flores and Walter Yovany-Gomez completed a "mission" as required by the PLS clique.

nn. On a date after May 8, 2011, but before July 2, 2011, KELVIN MEJIA arranged the transportation of Walter Yovany-Gomez from New Jersey to Maryland in order to help Walter Yovany-Gomez evade arrest and prosecution for Victim #15's murder.

oo. On or about May 11, 2011, RUBEN PORTILLO-FUENTES spoke by telephone to Victim #16, an inactive member of MS-13, and stated that Victim #16 was expected to make regular "rent" payments to MS-13. During this and subsequent conversations, RUBEN PORTILLO-FUENTES threatened to commit acts of violence against Victim #16 if he failed to make "rent" payments in a timely manner.

pp. On or about May 11, 2011, RUBEN PORTILLO-FUENTES, JULIAN MOZ-AGUILAR, and ESAU RAMIREZ agreed to collect "rent"

payments from Victim #16 and to use threats of violence to ensure that Victim #16 made the required payments.

qq.  On or about June 4, 2011, in New Jersey, FRANKLIN MEJIA and other members of MS-13 attacked Victim #17 with machetes because they believed that Victim #17 was associating with members of the rival Latin Kings gang.

rr.  On or about June 11, 2011, in Plainfield, New Jersey, JULIO ADALBERTO ORELLANA-CARRANZA asked JOSE GARCIA for his help in acquiring a firearm.  JULIO ADALBERTO ORELLANA-CARRANZA stated to JOSE GARCIA that he needed the firearm to complete a "mission."

ss.  On or about June 11, 2011, at the request of JULIO ADALBERTO ORELLANA-CARRANZA, JOSE GARCIA telephoned KELVIN MEJIA to ask to borrow a firearm.

tt.  On or about June 11, 2011, JULIO ADALBERTO ORELLANA-CARRANZA and at least one other person drove through Plainfield, New Jersey in search of the individual JULIO ADALBERTO ORELLANA-CARRANZA was instructed to murder as part of the "mission" described in Overt Act rr.

uu.  On or about June 15, 2011, in Plainfield, New Jersey, RUBEN PORTILLO-FUENTES attempted to murder Victim #18, who RUBEN PORTILLO-FUENTES believed to be a member of the rival 18th Street Gang, by attacking Victim #18 with a machete.

vv.    On or about June 15, 2011, in Plainfield, New Jersey, KELVIN MEJIA, FRANKLIN MEJIA, and another MS-13 member robbed two individuals, Victim #19 and Victim #20, at gunpoint in Green Brook Park in Plainfield, New Jersey.

ww.    On or about June 24, 2011, in Plainfield, New Jersey, JULIO ADALBERTO ORELLANA-CARRANZA, ESAU RAMIREZ, and FRANKLIN MEJIA plotted to commit an armed robbery of Victim #21, a woman who operated an underground liquor store in Plainfield.

xx.    On or about June 28, 2011, KELVIN MEJIA and FRANKLIN MEJIA threatened to kill an individual they believed was cooperating with law enforcement in the investigation and prosecution of the attempted murder described in Overt Act uu.

yy.    On or about June 30, 2011, KELVIN MEJIA spoke by telephone with an individual in Guatemala.  During the conversation, KELVIN MEJIA and the individual discussed the importation and distribution of cocaine.

zz.    On or about July 1, 2011, KELVIN MEJIA and FRANKLIN MEJIA spoke by telephone to discuss the price at which they would sell an amount of cocaine to another individual.

aaa. On or about July 2, 2011, in Plainfield, New Jersey, FRANKLIN MEJIA plotted with other members of MS-13 to locate Victim #17, who had survived the June 4, 2011 attack described in Overt Act qq, with the intent that they kill Victim #17.

bbb. On or about July 2, 2011, in Plainfield, New Jersey, while attempting to locate Victim #17, FRANKLIN MEJIA confronted one of Victim #17's associates, an MS-13 member described herein as Victim #22. During this confrontation, FRANKLIN MEJIA indicated to Victim #22 that he intended to kill Victim #17, prompting Victim #22 to punch FRANKLIN MEJIA in the face.

ccc. On or about July 2, 2011, after the confrontation described in Overt Act bbb, FRANKLIN MEJIA returned to a residence in Plainfield, New Jersey and stated to other MS-13 members, including KELVIN MEJIA, that he intended to kill Victim #22.

ddd. On or about July 2, 2011, as part of an effort to help FRANKLIN MEJIA kill Victim #22, KELVIN MEJIA telephoned another MS-13 member to determine the whereabouts of a firearm stored at a residence in Plainfield, New Jersey.

eee. On or about July 4, 2011, JOSE GARCIA and KELVIN MEJIA plotted to rob Victim #21 to raise bail money for MS-13 members detained at the Union County Jail.

fff. In or about July 2011, while detained at the Union County Jail, in Elizabeth, New Jersey, FRANKLIN MEJIA and ESAU RAMIREZ plotted with other MS-13 members to retaliate against a certain detective of the Plainfield Police Department ("Detective #1") that they considered responsible for their

arrest and detention. Among other things, FRANKLIN MEJIA and ESAU RAMIREZ discussed firebombing a residence belonging to the mother of Detective #1.

ggg. In or about July 2011 and continuing through at least August 2011, while detained at the Union County Jail, in Elizabeth, New Jersey, KELVIN MEJIA, FRANKLIN MEJIA, JOSE GARCIA, ESAU RAMIREZ, and JULIO ADALBERTO ORELLANA-CARRANZA plotted to intimidate and/or kill individuals they believed were cooperating with law enforcement in the prosecution of MS-13 members.

hhh. On or about August 1, 2011, in Elizabeth, New Jersey, ESAU RAMIREZ used a telephone located at the Union County Jail to call Jose Romero-Aguirre, a/k/a "Conejo," a/k/a "Justin Locote," a member of MS-13 charged in Count Twenty-Six of this Indictment and who, at the time of ESAU RAMIREZ's telephone call, was not detained in jail. During the call, ESAU RAMIREZ and Jose Romero-Aguirre plotted to kill certain individuals, including Victim #16, Victim #22, and Victim #23, that ESAU RAMIREZ believed were cooperating with law enforcement.

iii. On or about August 2, 2011, in Elizabeth, New Jersey, ESAU RAMIREZ used a telephone located at the Union County Jail to call Jose Romero-Aguirre, who was not then detained in jail. During the call, ESAU RAMIREZ instructed Jose

Romero-Aguirre to meet with other MS-13 members not then

detained in jail so that they could put into effect the witness-

murder plot discussed in Overt Act hhh.

jjj. On or about August 2, 2011, in Elizabeth, New

Jersey, during the phone conversation described in Overt Act

iii, Jose Romero-Aguirre stated that he would meet with other

members to plan the murder of witnesses as described in Overt

Act hhh.

All in violation of Title 18, United States Code, Section

1962(d).

### COUNT TWO
(Murder in Aid of Racketeering)

1.     The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     At all times relevant to this Indictment, La Mara Salvatrucha ("MS-13") constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.     At all times relevant to this Indictment, MS-13, the above-described enterprise, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), consisting of multiple acts involving offenses chargeable under the following provisions of New Jersey law:

           a.     Murder, in violation of N.J.S.A. 2C:11-3;

           b.     Robbery, in violation of N.J.S.A. 2C:15-1;

           c.     Extortion, in violation of N.J.S.A. 2C:20-5;

and multiple acts which are indictable under the following provision of Title 18, United States Code:

d.    18 U.S.C. § 1958(a) (murder-for-hire);

and offenses involving the felonious manufacture, importation, receiving, concealing, buying, selling, and otherwise dealing in a controlled substance punishable under the laws of the United States, specifically:

> e.    21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances);
>
> f.    21 U.S.C. § 841 (distribution and possession with intent to distribute controlled substances); and
>
> g.    21 U.S.C. §§ 952, 960, 963 (conspiracy to import controlled substances); and
>
> h.    21 U.S.C. § 843(b) (use of a communication facility).

4.    On or about February 8, 2009, in Union County, in the District of New Jersey and elsewhere, the defendants,

SANTOS REYES-VILLATORO,
a/k/a "Mousey," and
JULIAN MOZ-AGUILAR,
a/k/a "Humilde," a/k/a "Demente," a/k/a "Tio Felito,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly and purposely murder Victim #5, contrary to N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), and 2C:2-6.

In violation of Title 18, United States Code, Section 1959(a)(1) and Section 2.

COUNT THREE

(Using and Carrying a Firearm During a Crime of Violence)

On or about February 8, 2009, in Union County, in the

District of New Jersey, and elsewhere, the defendants,

SANTOS REYES-VILLATORO,
a/k/a "Mousey," and
JULIAN MOZ-AGUILAR,
a/k/a "Humilde," a/k/a "Demente," a/k/a "Tio Felito,"

during and in relation to a crime of violence for which they may

be prosecuted in a court of the United States, namely, the

Violent Crime in Aid of Racketeering alleged in Count Two of

this Indictment, did knowingly use and carry a firearm, which

was discharged.

In violation of Title 18, United States Code, Section

924(c)(1)(A)(iii) and Section 2.

## COUNT FOUR

(Causing Death Through Use of a Firearm)

On or about February 8, 2009, in Union County, in the District of New Jersey, and elsewhere, the defendants,

SANTOS REYES-VILLATORO,
a/k/a "Mousey," and
JULIAN MOZ-AGUILAR,
a/k/a "Humilde," a/k/a "Demente," a/k/a "Tio Felito,"

in the course of a violation of Title 18, United States Code, Section 924(c), as alleged in Count Three of this Indictment, did knowingly and purposely cause the murder of Victim #5 through the use of a firearm.

In violation of Title 18, United States Code, Section 924(j) and Section 2.

## COUNT FIVE

(Assault with a Dangerous Weapon in Aid of Racketeering)

1.    The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3.    On or about October 31, 2009, in Somerset County, in the District of New Jersey and elsewhere, the defendants,

> SANTOS REYES-VILLATORO,
> a/k/a "Mousey," and
> KELVIN MEJIA,
> a/k/a "Machete,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly and purposely assault Victim #6 and Victim #7 with a dangerous weapon, specifically a firearm, contrary to N.J.S.A. 2C:12-1(b)(2) and 2C:2-6.

In violation of Title 18, United States Code, Section 1959(a)(3) and Section 2.

## COUNT SIX

(Using and Carrying a Firearm During a Crime of Violence)

On or about October 31, 2009, in Somerset County, in the District of New Jersey, and elsewhere, the defendants,

SANTOS REYES-VILLATORO,
a/k/a "Mousey," and
KELVIN MEJIA,
a/k/a "Machete,"

during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the Violent Crime in Aid of Racketeering alleged in Count Five of this Indictment, did knowingly use and carry a firearm, which was discharged.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) and Section 2.

## COUNT SEVEN

(Threat to Commit a Crime of Violence in Aid of Racketeering)

1.    The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3.    On a date after October 31, 2009, but prior to February 27, 2010, in Somerset County, in the District of New Jersey and elsewhere, the defendants,

MARIO OLIVA,
a/k/a "Zorro," and
ROBERTO CONTRERAS,
a/k/a "Demonio,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly and purposely threaten a crime of violence, specifically, assault, contrary to N.J.S.A. 2C:12-1, against Victim #8 and Victim #9.

In violation of Title 18, United States Code, Section 1959(a)(4) and Section 2.

## COUNT EIGHT
### (Murder in Aid of Racketeering)

1.    The allegations contained in Paragraphs 1 through 16
and 19 through 25 of Count One of this Indictment are realleged
and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Paragraphs 1 through 3 of
Count Two of this Indictment are realleged and incorporated by
reference as though fully set forth herein.

3.    On or about February 27, 2010, in Middlesex County, in
the District of New Jersey and elsewhere, the defendant,

MARIO OLIVA,
a/k/a "Zorro,"

for the purpose of maintaining and increasing position in MS-13,
an enterprise engaged in racketeering activity, did knowingly
and purposely murder Victim #10, contrary to N.J.S.A. 2C:11-
3(a)(1), 2C:11-3(a)(2), and 2C:2-6.

In violation of Title 18, United States Code, Section
1959(a)(1) and Section 2.

## COUNT NINE
(Using and Carrying a Firearm During a Crime of Violence)

On or about February 27, 2010, in Middlesex County, in the District of New Jersey, and elsewhere, the defendant,

MARIO OLIVA,
a/k/a "Zorro,"

during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, namely, the Violent Crime in Aid of Racketeering alleged in Count Eight of this Indictment, did knowingly use and carry a firearm, which was discharged.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) and Section 2.

## COUNT TEN

(Causing Death Through Use of a Firearm)

On or about February 27, 2010, in Middlesex County, in the District of New Jersey, and elsewhere, the defendant,

MARIO OLIVA,
a/k/a "Zorro,"

in the course of a violation of Title 18, United States Code, Section 924(c), as alleged in Count Nine of this Indictment, did knowingly and purposely cause the murder of Victim #10 through the use of a firearm.

In violation of Title 18, United States Code, Section 924(j) and Section 2.

## COUNT ELEVEN

(Accessory After the Fact to Murder in Aid of Racketeering)

On a date after on or about February 27, 2010 but no later than on or about February 22, 2011, in Middlesex County, in the District of New Jersey and elsewhere, the defendant,

ROBERTO CONTRERAS,
a/k/a "Demonio,"

knowing that an offense against the United States had been committed, namely, the Violent Crime in Aid of Racketeering alleged in Count Eight of this Indictment, did intentionally receive, relieve, comfort, and assist the offenders, MARIO OLIVA and another member of MS-13, in order to hinder and prevent their apprehension, trial, and punishment.

In violation of Title 18, United States Code, Section 3.

## COUNT TWELVE
(Murder in Aid of Racketeering)

1. The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3. On or about November 10, 2010, in Union County, in the District of New Jersey and elsewhere, the defendant,

HUGO PALENCIA,
a/k/a "Taliban,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly and purposely murder Victim #11, contrary to N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), and 2C:2-6.

In violation of Title 18, United States Code, Section 1959(a)(1) and Section 2.

## COUNT THIRTEEN
(Using and Carrying a Firearm During a Crime of Violence)

On or about November 10, 2010, in Union County, in the District of New Jersey, and elsewhere, the defendant,

HUGO PALENCIA,
a/k/a "Taliban,"

during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, namely, the Violent Crime in Aid of Racketeering alleged in Count Twelve of this Indictment, did knowingly use and carry a firearm, which was discharged.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) and Section 2.

## COUNT FOURTEEN

(Causing Death Through Use of a Firearm)

On or about November 10, 2010, in Union County, in the District of New Jersey, and elsewhere, the defendant,

HUGO PALENCIA,
a/k/a "Taliban,"

in the course of a violation of Title 18, United States Code, Section 924(c), as alleged in Count Thirteen of this Indictment, did knowingly and purposely cause the murder of Victim #11 through the use of a firearm.

In violation of Title 18, United States Code, Section 924(j) and Section 2.

## COUNT FIFTEEN
(Murder-for-Hire Conspiracy)

1. From in or about December 2010 to in or about January 11, 2011, in Union County, in the District of New Jersey, and elsewhere, the defendants,

> JOSE GARCIA,
> a/k/a "Chucky," and
> HUGO PALENCIA,
> a/k/a "Taliban,"

did knowingly and intentionally conspire and agree with others to travel in and cause another to travel in interstate commerce, and to use the mail and facilities of interstate commerce, with intent that a murder be committed contrary to N.J.S.A. 2C:11-3(a)(1) and 2C:2-6, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value.

2. It was the object of the conspiracy for members of MS-13 to travel from Maryland to New Jersey to murder another person in exchange for a sum of money.

3. It was part of the conspiracy that, from in or about December 2010 through in or about January 11, 2011, members of the MS-13 living in New Jersey, including JOSE GARCIA, communicated with members of MS-13 living in Maryland by cellular telephone in furtherance of the conspiracy.

4.    It was further part of the conspiracy that members of MS-13 drove from Maryland to New Jersey on or about January 10, 2011 to assist JOSE GARCIA, HUGO PALENCIA, and others with a murder.

In violation of Title 18, United States Code, Section 1958(a) and Section 2.

## COUNT SIXTEEN

(Travel in Interstate Commerce With Intent to Commit Murder)

On or about January 10, 2011, in Union County, in the District of New Jersey, and elsewhere, the defendant,

JOSE GARCIA,
a/k/a "Chucky,"

did knowingly cause another to travel in interstate commerce, and use the mail and facilities of interstate commerce, with intent that a murder be committed in violation of N.J.S.A. 2C:11-3(a)(1) and 2C:2-6, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value.

In violation of Title 18, United States Code, Section 1958(a) and Section 2.

## COUNT SEVENTEEN

(Assault with a Dangerous Weapon in Aid of Racketeering)

1. The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3. On or about May 8, 2011, in Union County, in the District of New Jersey and elsewhere, the defendant,

JOSE GARCIA,
a/k/a "Chucky,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly and purposely assault Victim #14 with a dangerous weapon, specifically a gun and a block of wood, contrary to N.J.S.A. 2C:12-1(b)(2) and 2C:2-6.

In violation of Title 18, United States Code, Section 1959(a)(3) and Section 2.

## COUNT EIGHTEEN

(Conspiracy to Commit Murder in Aid of Racketeering)

1.    The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3.    Beginning on a date unknown to the Grand Jury but since at least May 8, 2011, and continuing through at least July 8, 2011, in Union County, in the District of New Jersey and elsewhere, the defendants,

> CRUZ FLORES,
> a/k/a "Bruja,"
> WALTER YOVANY-GOMEZ,
> a/k/a "Cholo," and
> KELVIN MEJIA,
> a/k/a "Machete,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, together with others known and unknown, did knowingly and intentionally conspire and agree with others known and unknown to commit murder, contrary to N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), and 2C:5-2.

4.    It was the object of the conspiracy for MS-13 members to kill actual and suspected members of rival street gangs, including the 18th Street Gang.

5.    It was part of the conspiracy that certain members of MS-13 were assigned "missions," which required these members to kill specific individuals, as per instructions by the gang's leadership.

6.    It was further part of the conspiracy that on or about May 8, 2011, CRUZ FLORES and WALTER YOVANY-GOMEZ killed Victim #15.

7.    It was further part of the conspiracy that on a date after May 8, 2011, KELVIN MEJIA arranged the transportation of WALTER YOVANY-GOMEZ from New Jersey to Maryland in order to help WALTER YOVANY-GOMEZ evade arrest and prosecution for Victim #15's murder.

In violation of Title 18, United States Code, Section 1959(a)(5) and Section 2.

## COUNT NINETEEN
### (Murder in Aid of Racketeering)

1.    The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3.    On or about May 8, 2011, in Union County, in the District of New Jersey and elsewhere, the defendants,

> CRUZ FLORES,
> a/k/a "Bruja," and
> WALTER YOVANY-GOMEZ,
> a/k/a "Cholo,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly and purposely murder Victim #15, contrary to N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), and 2C:2-6.

In violation of Title 18, United States Code, Section 1959(a)(1) and Section 2.

## COUNT TWENTY

(Conspiracy to Commit Murder in Aid of Racketeering)

1.    The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3.    Beginning on a date unknown to the Grand Jury but since at least May 8, 2011, and continuing through at least July 8, 2011, in Union County, in the District of New Jersey and elsewhere, the defendants,

JULIO ADALBERTO ORELLANA-CARRANZA,
a/k/a "Player," a/k/a "Stewie," a/k/a "Rata,"
JOSE GARCIA,
a/k/a "Chucky," a/k/a "Diabolico," and
KELVIN MEJIA,
a/k/a "Machete,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, together with others known and unknown, did knowingly and intentionally conspire and agree with others known and unknown to commit murder, contrary to N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), and 2C:5-2.

4.    It was the object of the conspiracy for MS-13 members
to kill actual and suspected members of rival street gangs,
including the 18th Street Gang.

5.    It was part of the conspiracy that certain members of
MS-13 were assigned "missions," which required these members to
kill specific individuals, as per instructions by the gang's
leadership.

6.    It was further part of the conspiracy that on or about
June 11, 2011, JULIO ADALBERTO ORELLANA-CARRANZA asked JOSE
GARCIA for his help in acquiring a firearm.  JULIO ADALBERTO
ORELLANA-CARRANZA stated to JOSE GARCIA that he needed the
firearm to complete a "mission."

7.    It was further part of the conspiracy that on or about
June 11, 2011, at the request of JULIO ADALBERTO ORELLANA-
CARRANZA, JOSE GARCIA telephoned KELVIN MEJIA to ask to borrow a
firearm.

8.    It was further part of the conspiracy that on or about
June 11, 2011, JULIO ADALBERTO ORELLANA-CARRANZA and at least
one other person drove through Plainfield, New Jersey in search
of the individual JULIO ADALBERTO ORELLANA-CARRANZA was
instructed to murder as part of his "mission."

9.    It was further part of the conspiracy that SANTOS
REYES-VILLATORO assigned KELVIN MEJIA to murder a specific
individual as part of his "mission."

In violation of Title 18, United States Code, Section 1959(a)(5) and Section 2.

COUNT TWENTY-ONE

(Assault with a Dangerous Weapon in Aid of Racketeering)

1. The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3. On or about June 15, 2011, in Union County, in the District of New Jersey and elsewhere, the defendant,

RUBEN PORTILLO-FUENTES,
a/k/a "Sombra,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly and purposely assault Victim #18 with a dangerous weapon, specifically a machete, contrary to N.J.S.A. 2C:12-1(b)(2) and 2C:2-6.

In violation of Title 18, United States Code, Section 1959(a)(3) and Section 2.

COUNT TWENTY-TWO

(Assault with a Dangerous Weapon in Aid of Racketeering)

1. The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3. On or about June 15, 2011, in Union County, in the District of New Jersey and elsewhere, the defendants,

KELVIN MEJIA,
a/k/a "Machete," and
FRANKLIN MEJIA,
a/k/a "Frankbo," a/k/a "Grillo,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly and purposely assault Victim #19 and Victim #20 with a dangerous weapon, specifically a firearm, contrary to N.J.S.A. 2C:12-1(b)(2) and 2C:2-6.

In violation of Title 18, United States Code, Section 1959(a)(3) and Section 2.

COUNT TWENTY-THREE

(Using and Carrying a Firearm During a Crime of Violence)

On or about June 15, 2011, in Union County, in the District of New Jersey, and elsewhere, the defendants,

KELVIN MEJIA,
a/k/a "Machete," and
FRANKLIN MEJIA,
a/k/a "Frankbo," a/k/a "Grillo,"

during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the Violent Crime in Aid of Racketeering alleged in Count Twenty-Two of this Indictment, did knowingly use and carry a firearm, which was discharged.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) and Section 2.

COUNT TWENTY-FOUR

(Conspiracy to Distribute Cocaine)

From at least as early as June 28, 2011 though no later than July 2, 2011, in Union County, in the District of New Jersey, and elsewhere, the defendants,

KELVIN MEJIA,
a/k/a "Machete," and
FRANKLIN MEJIA,
a/k/a "Frankbo," a/k/a "Grillo,"

did knowingly and intentionally conspire and agree with each other and others to distribute and to possess with intent to distribute cocaine, a Schedule II controlled substance, contrary to Title 21, Untied States Code, Sections 841(a)(1) and 841(b)(1)(C).

In violation of Title 21, United States Code, Section 846.

## COUNT TWENTY-FIVE

(Conspiracy to Commit Murder in Aid of Racketeering)

1. The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3. From on or about July 2, 2011 through on or about July 3, 2011, in Union County, in the District of New Jersey and elsewhere, the defendants,

KELVIN MEJIA,
a/k/a "Machete," and
FRANKLIN MEJIA,
a/k/a "Frankbo," a/k/a "Grillo,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, together with others known and unknown, did knowingly and intentionally conspire and agree with others known and unknown to murder Victim #22, contrary to N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), 2C:2-6, and 2C:5-2.

In violation of Title 18, United States Code, Section 1959(a)(5) and Section 2.

COUNT TWENTY-SIX

(Conspiracy to Commit Murder in Aid of Racketeering)

1.    The allegations contained in Paragraphs 1 through 16 and 19 through 25 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Paragraphs 1 through 3 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3.    From on or about July 2, 2011 through at least in or about August 2011, in Union County, in the District of New Jersey and elsewhere, the defendants,

JOSE ROMERO-AGUIRRE,
a/k/a "Conejo," a/k/a "Justin Locote,"
JULIO ADALBERTO ORELLANA-CARRANZA,
a/k/a "Player," a/k/a "Stewie," a/k/a "Rata,"
JOSE GARCIA,
a/k/a "Chucky,"
RUBEN PORTILLO-FUENTES,
a/k/a "Sombra,"
ESAU RAMIREZ,
a/k/a "Panda,"
KELVIN MEJIA,
a/k/a "Machete," and
FRANKLIN MEJIA,
a/k/a "Frankbo," a/k/a "Grillo,"

for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, together with others known and unknown, did knowingly and intentionally conspire and agree with others known and unknown to murder

government witnesses, contrary to N.J.S.A. 2C:11-3(a)(1) and
(2), 2C:2-6, and 2C:5-2.

4.     It was the object of the conspiracy for MS-13 members
to kill three individuals -- Victim #16, Victim #22, and Victim
#23 -- believed to be cooperating with law enforcement in its
investigation of MS-13, as well as other individuals who posed a
threat to the gang.

5.     It was part of the conspiracy that, while detained at
the Union County Jail in or about July 2011, JOSE GARCIA, RUBEN
PORTILLO-FUENTES, ESAU RAMIREZ, KELVIN MEJIA, FRANKLIN MEJIA,
and JULIO ORELLANA-CARRANZA, communicated with each other in
order to identify individuals believed to be cooperating with
law enforcement.

6.     It was further part of the conspiracy that ESAU
RAMIREZ communicated by jailhouse telephone with MS-13 member
JOSE ROMERO-AGUIRRE, who at the time was not detained in jail
and was living in central New Jersey. During these
communications, ESAU RAMIREZ instructed JOSE ROMERO-AGUIRRE to
work with other, non-incarcerated MS-13 members to kill Victim
#16, Victim #22, and Victim #23.

In violation of Title 18, United States Code, Section
1959(a)(5) and Section 2.

NOTICE OF SPECIAL SENTENCING FACTORS REGARDING COUNT ONE

1.     The allegations of Count One of this Indictment are hereby realleged and reincorporated as though set forth in full herein.

2.     On or about February 7, 2009, in Plainfield, New Jersey, SANTOS REYES-VILLATORO, a/k/a "Mousey," and JULIAN MOZ-AGUILAR, a/k/a "Humilde," a/k/a "Demente," a/k/a "Tio Felito," knowingly and purposely caused the death of Victim #5, in violation of N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), and 2C:2-6.

3.     On or about February 27, 2010, in Piscataway, New Jersey, MARIO OLIVA, a/k/a "Zorro," knowingly and purposely caused the death of Victim #10, in violation of N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), and 2C:2-6.

4.     On or about November 11, 2010, in Plainfield, New Jersey, HUGO PALENCIA, a/k/a "Taliban," knowingly and purposely caused the death of Victim #11, in violation of N.J.S.A. 2C:11-3(a)(1), 2C:11-3(a)(2), and 2C:2-6.

## NOTICE OF SPECIAL FINDINGS

1.    The allegations of Counts Two, Four, Eight, Ten, Twelve, Fourteen, and Nineteen of this Indictment are hereby realleged and reincorporated as though set forth in full herein.

2.    As to Counts Two and Four of this Indictment, the defendant SANTOS REYES-VILLATORO, a/k/a "Mousey":

> a.    was 18 years of age or older at the time of the offense, 18 U.S.C. § 3591(a);
>
> b.    intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Victim #5 died as a direct result of the act, 18 U.S.C. § 3591(a)(2)(C); and
>
> c.    committed the offense after substantial planning and premeditation to cause the death of a person, 18 U.S.C. § 3592(c)(9).

3.    As to Counts Two and Four of this Indictment, the defendant JULIAN MOZ-AGUILAR, a/k/a "Humilde," a/k/a "Demente," a/k/a "Tio Felito":

> a.    was 18 years of age or older at the time of the offense, 18 U.S.C. § 3591(a);

        b.    intentionally killed Victim #5, 18 U.S.C. §
3591(a)(2)(A); and

        c.    committed the offense after substantial planning
and premeditation to cause the death of a person, 18
U.S.C. § 3592(c)(9).

    4.    As to Counts Eight and Ten of this Indictment, the
defendant MARIO OLIVA, a/k/a "Zorro":

        a.    was 18 years of age or older at the time of the
offense, 18 U.S.C. § 3591(a);

        b.    intentionally killed Victim #10, 18 U.S.C. §
3591(a)(2)(A); and

        c.    committed the offense after substantial planning
and premeditation to cause the death of a person, 18
U.S.C. § 3592(c)(9).

    5.    As to Counts Twelve and Fourteen of this Indictment,
the defendant HUGO PALENCIA, a/k/a "Taliban":

        a.    was 18 years of age or older at the time of the
offense, 18 U.S.C. § 3591(a);

        b.    intentionally participated in an act,
contemplating that the life of a person would be taken
and intending that lethal force would be used in
connection with a person, other than one of the
participants in the offense, and Victim #11 died as a

direct result of the act, 18 U.S.C. § 3591(a)(2)(C); and

c. in the commission of the offense, knowingly created grave risk of death to one or more persons in addition to the victim of the offense, 18 U.S.C. § 3592(c)(5).

6. As to Count Nineteen of this Indictment, the defendant CRUZ FLORES, a/k/a "Bruja":

a. was 18 years of age or older at the time of the offense, 18 U.S.C. § 3591(a);

b. intentionally killed Victim #15, 18 U.S.C. § 3591(a)(2)(A); and

c. committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, 18 U.S.C. § 3592(c)(6).

7. As to Count Nineteen of this Indictment, the defendant WALTER YOVANY-GOMEZ, a/k/a "Cholo":

a. was 18 years of age or older at the time of the offense, 18 U.S.C. § 3591(a);

b. intentionally killed Victim #15, 18 U.S.C. § 3591(a)(2)(A); and

c. committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture

or serious physical abuse to the victim, 18 U.S.C. §
3592(c)(6).

A TRUE BILL

PAUL J. FISHMAN
United States Attorney

CASE NUMBER: 13-615 (SRC)

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

**v.**

**SANTOS REYES-VILLATORO, et al.**

# INDICTMENT FOR

18 U.S.C. §§ 924(c), 924(j), 1958(a)
1959(a)(1), 1959(a)(3), 1959(a)(4),
1959(a)(5), 1962(d), 2, and 3;
21 U.S.C. § 846

**A True Bill,**

_____

**Foreperson**

**PAUL J. FISHMAN**
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

JAMES M. DONNELLY / ANDREW J. BRUCK
*ASSISTANT U.S. ATTORNEYS*
*(973) 645-2734*

2013 SEP 19 P 4:45

U.S. DISTRICT COURT

USA-48AD 8
(Ed. 1/97)